1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYAN KEARNEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOODRX HOLDINGS, INC., DOUGLAS HIRSCH, TREVOR BEZDEK, and KARSTEN VOERMANN,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Bryan Kearney ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by GoodRx Holdings, Inc. ("GoodRx" or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of all persons or entities other than Defendants who purchased or otherwise acquired GoodRx securities between September 23, 2020 and November 16, 2020, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     GoodRx purports to provide consumers with free information and tools that allow them to compare prices and save on their prescription drug purchases.   The Company purports to provide its users with these services via apps and websites that display prices and discounts at local and mail-order pharmacies for both insured and uninsured Americans.

3.     At the time of the Company's September 2020 initial public offering ("IPO"), unbeknownst to investors, Amazon.com, Inc. ("Amazon") was developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service that would directly compete with GoodRx.  Defendants timed the IPO so that it was priced before Amazon announced its online pharmaceutical business to facilitate the IPO and create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and the selling stockholders could raise in the IPO.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants were aware that Amazon had been in the process of developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service, and timed the IPO so that it was priced before Amazon announced its online pharmaceutical business; (ii) accordingly, Defendants timed the IPO

to create artificial demand for the common shares sold therein; (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On November 17, 2020, just weeks after GoodRx completed its IPO, Amazon announced two new pharmacy offerings, a Prime Rx plan and a discount card program, which, among other things, would compete directly with GoodRx's platform by making it "simple for customers to compare prices and purchase medications for home delivery, all in one place."  The Amazon press release stated, in relevant part:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership.
>
> *     *     *
>
> Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.
>
> ***Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place***.

6.     That same day, CNBC.com reported that Amazon Prime members would now have access to discounts of up to 80% on generic medications and up to 40% on

brand-name prescriptions through its relationship with the Inside Rx savings program. This competitive pricing posed a severe threat to GoodRx's business model.

7.    On this news, the price of GoodRx common stock fell $10.51 per share, or 23%, to close at $36.21 per share on November 17, erasing more than $4 billion of the Company's market capitalization on extremely heavy trading volume of over 23 million shares traded.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  GoodRx is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, purchased GoodRx securities during the Class Period and has been damaged thereby.

14.     Defendant GoodRx is a holding company that owns and operates a U.S. consumer-focused digital healthcare platform.   The Company maintains its principal executive offices in Santa Monica, California and its common stock is listed and trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "GDRX."

15.     Defendant Douglas Hirsch ("Hirsch") has served as GoodRx's Co-Chief Executive and as a director at all relevant times.

16.     Defendant Trevor Bezdek ("Bezdek") has served as GoodRx's Co-Chief Executive and as a director of GoodRx at all relevant times.

17.     Defendant Karsten Voermann ("Voermann") has served as GoodRx's Chief Financial Officer at all relevant times.

18.     Defendants Hirsch, Bezdek and Voermann are sometimes referred to hereina as the "Individual Defendants."

- 5 -

19.     GoodRx and the Individual Defendants are collectively referred to herein as "Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of GoodRx's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of GoodRx's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with GoodRx, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GoodRx securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding GoodRx's business, operations, services, competition, competitive market trends and present and future business prospects; (ii) facilitated the Company's September 2020 initial public offering ("IPO"); (iii) created artificial demand for the GoodRx common shares sold in the IPO; (iv) enabled the Company to receive *$887 million* in net proceeds from the sale of GoodRx

common stock in the IPO; (v) enabled certain existing shareholders, including affiliates of the Individual Defendants, executive officers and Company employees, to collectively reap gross proceeds of more than *$369 million* from the sale of GoodRx common stock in the IPO; and (vi) caused Plaintiff and the Class to purchase GoodRx publicly traded securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Nearly a decade ago, Defendant Hirsch, a former Facebook Inc. executive, and Defendant Bezdek created what has now become a popular and fast-growing digital U.S. prescription drug shopping platform designed to aid people in finding the lowest prescription drug prices in their local areas.  In October 2015, GoodRx acquired 100% of the outstanding shares of GoodRx, Inc., the entity that owns and operates the digital shopping platform created by Defendants Hirsch and Bezdek.

23.     GoodRx purports to provide consumers with free information and tools that allow them to compare prices and save on their prescription drug purchases.  The Company purports to provide its users with these services via apps and websites that display prices and discounts at local and mail-order pharmacies for both insured and uninsured Americans.

24.     GoodRx primarily earns its revenue from prescription transaction fees paid by Pharmacy Benefit Managers ("PBMs") that manage formularies and prescription

transactions.   The Company also generates revenue from subscription, advertising and telehealth services.

25.   Generally, PBMs are obligated to pay the Company prescription transaction fees when a prescription is filled with a GoodRx code provided through its platform that allows the consumer to purchase the prescribed drug at a price that is less than a pharmacy's list price.  The agreements between GoodRx and PBMs generally provide that when a consumer uses a GoodRx code presented on its platform, the Company is entitled to either a percentage of fees the PBM charges the pharmacy or a fixed amount per type of medication prescription.  GoodRx recognizes revenue for the estimated fee due from the PBM when the pharmacy fills the prescribed medication.

26.   On August 28, 2020, GoodRx filed with the SEC the Registration Statement for its IPO, signed by the Individual Defendants.  The Registration Statement, as amended, was declared effective by the SEC on September 22, 2020.

27.   On September 24, 2020, GoodRx filed with the SEC the "Prospectus for the IPO, offering to sell to the public over 23.4 million common shares by the Company (excluding the underwriters' option to purchase an additional 5.2 million common shares) and 11.2 million common shares by certain selling stockholders.

28.   On September 25, 2020, GoodRx closed its IPO.   In the offering, the Company and certain existing stockholders sold over 39.8 million common shares for $33

per share, including the full exercise of the underwriters' option, generating over $1.3 billion in gross offering proceeds.

29.     At the time of the IPO, unbeknownst to investors, Amazon was developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service that would directly compete with GoodRx.  Defendants timed the IPO so that it was priced before Amazon announced its online pharmaceutical business to facilitate the IPO and create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and the selling stockholders could raise in the IPO.  Given Defendants' knowledge of Amazon's intention to enter the online pharmaceutical business, and their misleading statements about GoodRx's competitive position made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused GoodRx securities to trade at artificially inflated prices during the Class Period.

**Materially False and Misleading Statements Issued During the Class Period**

30.     The Class Period begins on September 23, 2020, the first day GoodRx common stock began publicly trading on the NASDAQ.  The previous day, the SEC had declared the Registration Statement effective.  The Registration Statement remained alive and uncorrected throughout the Class Period and was incorporated into and formed part of the Prospectus filed on September 24, 2020.

31.     The Registration Statement contained materially false and misleading statements about GoodRx's competitive positioning, stating, in relevant part: ***"Our partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform***, which processes over 150 billion pricing data points every day and integrates that data into an interface that is convenient and easy to use for consumers."[1]

32.     Similarly, the Registration Statement stated, in relevant part: ***"We are a market leader with a significant scale and brand advantage over our competitors*. *Our growth accelerates self-reinforcing network effects that further strengthen our competitive position*.**"

33.     The Registration Statement further identified various competitive advantages which purportedly "set[] [GoodRx] [a]part," stating, in pertinent part:

**What Sets Us Apart**

***We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position. Our competitive strengths consist of***:

- ***Leading Platform:*** We believe that we are the largest platform that aggregates pricing for prescriptions. Our proprietary platform enables us to collect and normalize over 150 billion prescription pricing data points every day from sources spanning the healthcare industry.

---

[1]     Unless otherwise noted, all emphasis herein is added.

- **Trusted Brand:** We have built a trusted brand based on nearly a decade of consumer-focused product development. We strive to be with the consumer throughout their healthcare journey. We are guided by the principle of doing well for consumers and the healthcare industry as a whole, which we believe helps us build trust, engagement and brand loyalty.

- **Scaled and Growing Network:** Our leading consumer-focused digital healthcare platform and brand have facilitated rapid growth in our consumer base, which has helped us achieve significant scale. As we have scaled, we have been able to increase the savings that we provide our consumers, in part by leveraging our growing consumer base to attract more partners and source better prices.

- **Consumer-focus:** We empower consumers with the tools and resources to navigate the complexity of the healthcare system. Our platform delivers a consumer-first experience that is convenient and is easy to use and understand.

- **Extensible Platform:** The large number of highly engaged consumers who trust our brand and platform provide a strong foundation for the development of new products that extend across the healthcare market. We have demonstrated our ability to develop new products such as our subscription offerings and pharmaceutical manufacturer solutions offering, and integrate acquired companies such as HeyDoctor.

- **Cash Generative Monetization Model:** We believe our business model has facilitated the rapid growth and expansion of our platform. We have a track record of generating cash flows, allowing us to reinvest in platform expansion and growth.

34.     In addition, the Registration Statement provided generic statements of potential competitive pressures that "may" or "could" impact GoodRx's business in the future, but failed to disclose the imminent and known direct competitor that was being developed by Amazon at the time of the IPO, which would have severe negative

- 11 -

consequences for GoodRx's business, operations and financial prospects. Indeed, the Registration Statement did not even identify Amazon as a potential competitor, instead stating, in relevant part:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We ***may*** face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers.

35.    Rather than disclose the truth, the Registration Statement highlighted the Company's purported successes in growing its market share, stating, in relevant part:

> Our success is demonstrated by our 4.4 million Monthly Active Consumers for the second quarter of 2020, the 15 million Monthly Visitors for the second quarter of 2020, the approximately $20 billion of cumulative consumer savings generated for GoodRx consumers through June 30, 2020 and our consumer and healthcare professional NPS scores of 90 and 86, respectively, as of February 2020. On average, we have been the most downloaded medical app on the Apple App Store and Google Play App Store for the last three years. Our GoodRx app had a rating of 4.8 out of 5.0 stars in the Apple App Store and 4.7 out of 5.0 stars in the Google Play App Store, with over 700,000 combined reviews as of June 30, 2020. In both app stores, our HeyDoctor app had a rating of 5.0 out of 5.0 stars, with over 8,000 combined reviews as of June 30, 2020.

36.    The Registration Statement likewise stated: "We believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

37.    Moreover, the Registration Statement highlighted the Company's close cooperation with Amazon and the purported benefits provided to GoodRx's business and platform as a result of this close relationship.  For example, the Registration Statement represented: "We leverage major third-party cloud and data service providers, such as Amazon Web Services" and claimed that GoodRx had "built a modular system of services on top of this infrastructure" that was "cloud native, scalable and reliable."  The Registration Statement continued, in relevant part:

**_We rely on software-as-a-service, or SaaS, technologies from third parties._**

   We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

38.    On November 12, 2020, GoodRx issued a press release announcing its financial results for the 2020 third quarter, the period ended September 30, 2020.  Later that day, GoodRx hosted an earnings call with investors and analysts to discuss the Company's results for the third quarter of 2020 (the "Q3 2020 Earnings Call").  During the Q3 2020 Earnings Call, just four business days before Amazon announced its intention

to enter the online pharmaceutical business, Defendants were asked by a securities analyst to "talk about any changes you're seeing in the competitive environment." In response, Defendant Bezdek falsely and misleadingly stated, in pertinent part, "**_what we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently_**."

39.    The statements referenced in ¶¶ 30-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants were aware that Amazon had been in the process of developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service, and timed the IPO so that it was priced before Amazon announced its online pharmaceutical business; (ii) accordingly, Defendants timed the IPO to create artificial demand for the common shares sold therein; (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

40.    On November 17, 2020, just weeks after GoodRx completed its IPO, Amazon announced two new pharmacy offerings, a Prime Rx plan and a discount card program, which, among other things, would compete directly with GoodRx's platform by making it

"simple for customers to compare prices and purchase medications for home delivery, all in one place."  The Amazon press release stated, in relevant part:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership.

> \*     \*     \*

> Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.

> ***Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place***.

41.    That same day, CNBC.com reported that Amazon Prime members would now have access to discounts of up to 80% on generic medications and up to 40% on brand-name prescriptions through its relationship with the Inside Rx savings program. This competitive pricing posed a severe threat to GoodRx's business model.

42.    On this news, the price of GoodRx common stock fell $10.51 per share, or 23%, to close at $36.21 per share on November 17, erasing more than $4 billion of the Company's market capitalization on extremely heavy trading volume of over 23 million

- 15 -

shares traded.  Prior to the disclosure of the adverse facts detailed above, Andrew Slutsky, the Company's Consumer President, and Idea Men, LLC, an entity whose managing members included Defendants Hirsch and Bezdek, collectively sold $132 million worth of GoodRx common stock in the IPO.

43.     Then, after Amazon's Prime Rx plan and discount card program were made public, securities analysts downgraded and slashed price targets on GoodRx common shares on fears that Amazon's pharmacy offerings would materially impact the Company's business and that GoodRx's price saving tools could be made irrelevant by Amazon's discounts.

44.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

45.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding the GoodRx's competitive landscape, their

control over, and/or receipt and/or modification of GoodRx's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning GoodRx, participated in the fraudulent scheme alleged herein.

46.    The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.   Given their executive level positions with GoodRx, the Individual Defendants controlled the contents of GoodRx's public statements during the Class Period.   The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.   Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.   As a result, each of the Individual Defendants was responsible for the accuracy of GoodRx's corporate statements and is, therefore, responsible and liable for the representations contained therein.

47.     Plaintiff also alleges that scienter of the Individual Defendants (who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of GoodRx) can be imputed to GoodRx.

48.     Further evidencing their scienter, Defendants timed the IPO so that it was priced before Amazon announced its online pharmaceutical business to facilitate the IPO and create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and selling shareholders could raise in the IPO.  The Company received **$887 million** in net proceeds from the sale of GoodRx common stock in the IPO and Andrew Slutsky, the Company's Consumer President, and Idea Men, LLC, an entity whose managing members included Defendants Hirsch and Bezdek, collectively sold **$132 million** of GoodRx common stock in the IPO.  In total, GoodRx insiders collectively reaped gross proceeds of more than **$369 million** from the sale of GoodRx common stock in the IPO.

49.     Moreover, Defendants were aware that Amazon's entry into the online prescription medication ordering and fulfillment business was imminent because Amazon was a close business partner with GoodRx.  Furthermore, Amazon subsequently teamed up with Inside Rx.  GoodRx has been a partner of Inside Rx since May 2017, and its website states that it and Inside Rx have partnered with major drug manufacturers and pharmacies to reduce the cost of more than 209 brand-name prescription drugs.  The Company's close connections to and cooperation with Amazon, both directly and through

Inside Rx, further confirm Defendants acted with scienter in making the materially false and misleading statements identified herein.

50.    Given Defendants' knowledge of Amazon's intention to enter the online pharmaceutical business and their misleading statements about GoodRx's competitive position made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused GoodRx securities to trade at artificially inflated prices during the Class Period.

## LOSS CAUSATION

51.    As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GoodRx securities. This scheme operated as a fraud or deceit on Class Period purchasers of GoodRx securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of GoodRx securities declined significantly as the prior artificial inflation came out of the price of GoodRx securities.

52.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of GoodRx's business, prospects and operations. Defendants' false and misleading statements had the intended effect and caused GoodRx common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $64.22 per share on September 29, 2020. Following the adverse revelations

detailed herein, the price GoodRx common stock fell to a low of just $33.51 per share on November 18, 2020 – *48% below* the Class Period high.  As a result of their purchases of GoodRx securities at artificially inflated prices during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.,* damages, under the federal securities laws.

53.   When the truth about the Company was revealed to the market, the price of GoodRx securities fell significantly.  The decline removed the inflation from the price of GoodRx securities, causing real economic loss to investors who had purchased GoodRx securities during the Class Period.  The decline in the price of GoodRx securities when the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in GoodRx securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

54.   The economic loss, *i.e.,* damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of GoodRx securities and the subsequent significant decline in the value of GoodRx securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

- 20 -

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

55.    At all relevant times, the market for GoodRx secutiries was an efficient market for the following reasons, among others:

(a)    GoodRx common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    as a regulated issuer, GoodRx filed periodic public reports with the SEC and the NASDAQ;

(c)    GoodRx regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    GoodRx was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

56.    As a result of the foregoing, the market for GoodRx securities promptly digested current information regarding GoodRx from all publicly available sources and reflected such information in the price of GoodRx securities.  Under these circumstances, all purchasers of GoodRx securities during the Class Period suffered similar injury through

their purchase of GoodRx securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

57.   The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements plead in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GoodRx who knew that the statement was false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.   Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased or

otherwise acquired GoodRx securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

- Whether the price of GoodRx securities was artificially inflated; and

- 23 -

- • The extent of damage sustained by members of the Class and the appropriate measure of damages.

61.  Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

62.  Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

63.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule l0b-5 Promulgated Thereunder Against All Defendants)

64.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.  This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.  During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GoodRx securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire GoodRx securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GoodRx securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GoodRx's finances and business prospects.

68. By virtue of their positions at GoodRx, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or

refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of GoodRx, the Individual Defendants had knowledge of the details of GoodRx's internal affairs.

70.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GoodRx.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GoodRx's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GoodRx securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning GoodRx's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired

GoodRx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, GoodRx securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GoodRx securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GoodRx securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of GoodRx securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective

purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

74.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

75.    The Individual Defendants acted as controlling persons of GoodRx within the meaning of §20(a) of the Exchange Act.

76.    Defendants Hirsch and Bezdek, via their affiliation with Idea Men, LLC, were among the largest beneficial owners of GoodRx common stock prior to the IPO.

77.    During the Class Period, the Individual Defendants participated in the operation and management of GoodRx, and conducted and participated, directly and indirectly, in the conduct of GoodRx's business affairs.  Because of their senior positions, they knew the adverse non-public information about GoodRx's misstatement of income and expenses and false financial statements.

78.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GoodRx's financial condition and results of operations, and to correct promptly any public statements issued by GoodRx which had become materially false or misleading.

79.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GoodRx disseminated in the marketplace during the Class Period concerning GoodRx's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GoodRx to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GoodRx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GoodRx securities.

80.    Each of the Individual Defendants, therefore, acted as a controlling person of GoodRx.  By reason of their senior management positions and/or being directors of GoodRx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GoodRx to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of GoodRx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GoodRx.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  January 8, 2021                          Respectfully submitted,


                                                 **POMERANTZ LLP**

                                                 */s/ Jennifer Pafiti*
                                                 Jennifer Pafiti (SBN 282790)
                                                 1100 Glendon Avenue, 15th Floor
                                                 Los Angeles, California 90024
                                                 Telephone: (310) 405-7190
                                                 Facsimile: (917) 463-1044
                                                 jpafiti@pomlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*